UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | <u>FILE UNDER SEAL</u> |
| v. | : | CRIMINAL No. 3:16cr124(SRU) |
| MITCHELL ANDERSON | : | February 5, 2018 |

# <u>GOVERNMENT'S SENTENCING MEMORANDUM AND MEMORANDUM IN SUPPORT OF ITS MOTION FOR A DOWNWARD DEPARTURE</u>

The United States respectfully submits this memorandum of law in aid of sentencing and in support of its substantial assistance motion in this case pursuant to Section 5K1.1 of the United States Sentencing Guidelines. Sentencing for the defendant, Mitchell Anderson, is scheduled for February 16, 2018.

The Government's motion requests that the Court impose a sentence below Anderson's applicable guideline range because Anderson has provided substantial assistance to the Government in the investigation and prosecution of others. The nature, extent, and significance of Anderson's cooperation are detailed in this memorandum.

## I. <u>INTRODUCTION</u>

### A. <u>Background</u>

On October 6, 2015, the *Hartford Courant* broke a story about the Dillon Stadium renovation project. That story revealed that one of the developers in the project, James Duckett, had a prior criminal record for embezzlement. Soon after the

1

story broke, the City realized that hundreds of thousands of dollars allocated to the project were missing and unaccounted for by the project manager, Premier Sports Management ("PSMG").

Shortly thereafter, on October 19, 2015, Mitchell Anderson and his then-counsel, William Gerace, Esq., met with members of the U.S. Attorney's Office and agents of the Federal Bureau of Investigation ("FBI") for the first of what would be several proffer interviews.  In that first interview, Anderson laid out the basic framework of the fraud that he and Duckett committed: that they had wrongfully used monies paid by the City to PSMG for PSMG's sub-contractors for matters that did not relate to the Dillon Stadium project.  Anderson pieced together the story from the inception of the project through the Hartford City Council meeting that had occurred just two weeks prior, explaining how monies intended for the sub-contractors of the project had instead been directed to a shadowy company known as Moolex, a friend of Mr. Duckett's named Derek Edwards, and Mr. Duckett's own company, Black Diamond.

Following this lengthy initial proffer session, ███████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

███  The parties held a second lengthy proffer session with Anderson on

December 22, 2015, in which the Government went over with Anderson the details of the PSMG bank records that it had obtained and dozens of PSMG emails that Anderson had previously provided to investigators.

On June 15, 2016, a grand jury in New Haven, Connecticut, returned a 15-page indictment charging Anderson and Duckett with a fraud conspiracy in connection with the Dillon Stadium project.  *See* Doc. 1.[1]  Shortly thereafter, Mr. Anderson's new counsel indicated to the Government that Mr. Anderson intended to plead guilty to the charges and wished to continue his cooperation, but asked for time to review the Government's discovery materials in order to better understand the scope of restitution that Mr. Anderson would be facing.

On February 6, 2017, Anderson entered his guilty plea in this case and also signed a cooperation agreement with the Government.  Soon thereafter, the Government disclosed the fact of Mr. Anderson's cooperation to counsel for James Duckett.

When it became clear that Duckett would elect to proceed to trial in his case, the Government began meeting with Mr. Anderson to prepare for trial.  These preparations included two lengthy meetings with the Government as well as Mr. Anderson reviewing in detail the written discovery materials in this case.  As the Court is aware, Mr. Anderson testified in the Government's direct case against

---

[1] There was a several month period in 2016 when the parties did not communicate, which the Government attributes to the fact that Anderson terminated his relationship with his retained counsel and obtained his current attorney, Michael Dolan, Esq.

Duckett and his testimony spanned the course of two trial days. On July 6, 2017, the jury in Duckett's case returned a verdict of guilty on Count One (conspiracy to commit wire and mail fraud), Counts Eight through Ten (wire fraud), and Counts Eleven, Thirteen, Fourteen, Sixteen through Eighteen, Twenty-Two and Twenty-Three of the Indictment (illegal monetary transactions).

    B.    <u>The Pre-Sentence Report</u>

At sentencing, as to Count One (conspiracy to commit mail and wire fraud), Anderson faces a maximum term of imprisonment of 20 years, a three-year term of supervised release, a $250,000 fine and a $100 special assessment. As to Count Sixteen (illegal monetary transactions), Anderson faces a term of imprisonment of up to 10 years, a three-year term of supervised release, a $250,000 fine and a $100 special assessment.

The parties have agreed that Anderson shall make restitution to the victims of the offense, the City of Hartford and Quisenberry Arcari. The Government will file a separate pleading addressing the restitution issues.

The Probation Office calculates Anderson's Sentencing Guidelines at an offense level 21 using a grouping analysis based upon the total loss involved in the fraud, which the parties agree was greater than $550,000. PSR ¶31; U.S.S.G. §§ 2S1.1(a)(1), 2B1.1(a)(1), 2B1.1(b)(1)(H). One level is added under U.S.S.G. § 2S1.1(b)(2)(A) because Anderson pleaded guilty to a count involving illegal monetary transactions.

With a three-level reduction for acceptance of responsibility, *see* PSR ¶¶ 38-39,

Anderson's total offense level under the Guidelines is 19.

Anderson has a Criminal History Category of I as he has no prior arrests or convictions.  PSR ¶ 43.  As a result, he faces an advisory Guidelines range of 30 to 37 months of imprisonment.  PSR ¶90.

## II. DISCUSSION

Section 5K1.1 of the Sentencing Guidelines permits the Court to impose a sentence of imprisonment below a defendant's applicable Sentencing Guideline range

> [u]pon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, . . .

18 U.S.C. § 3553(e); U.S.S.G. § 5K1.1.  The decision whether to make a motion for downward departure rests exclusively with the Government, subject only to constitutional limitations.  18 U.S.C. § 3553(e); U.S.S.G. § 5K1.1; *see United States v. Johnson*, 567 F.3d 40, 52 (2d Cir. 2009) (citing *United States v. Wade*, 504 U.S. 181, 185-86 (1992); *see also United States v. Garcia*, 926 F.2d 125, 128 (2d Cir. 1991) (quoting *United States v. Rexach*, 896 F.2d 710, 714 (2d Cir. 1990)); *United States v. Khan*, 920 F.2d 1100 (2d Cir. 1991); *United States v. Huerta*, 878 F.2d 89 (3d Cir. 1989).  The Court in *Huerta* observed that the question of "substantial assistance" is "self evidently a question that the prosecution is uniquely fit to resolve."  *Huerta*, 878 F.2d at 92.  The Sentencing Guidelines provide that the appropriate reduction shall be determined by the Court based upon, but not limited to, the following considerations:

> (1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the

>           government's evaluation of the assistance rendered;
>
> (2)     the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;
>
> (3)     the nature and extent of the defendant's assistance;
>
> (4)     any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance; and
>
> (5)     the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1(a).

Application Note 3 to the commentary of Section 5K1.1 provides that "substantial weight should be given to the Government's evaluation of the extent of defendant's assistance, particularly where the extent and value of the assistance are difficult to ascertain." *Id*. *See also Rexach*, 896 F.2d at 714.

    A.    <u>Nature and Extent of Anderson's Assistance</u>

Anderson has provided significant and substantial assistance as contemplated in the referenced Guidelines and statutory authority. The granting of a motion pursuant to Section 5K1.1 is therefore warranted.

As set forth above, only two weeks after this investigation came to light, Anderson agreed through counsel to meet with the Government and the criminal investigators. In that initial, lengthy proffer session, Anderson was forthcoming in admitting his own conduct and in trying to explain all of the details of the Dillon Stadium debacle. It was clear during this initial meeting that Anderson was still trying to understand everything that had occurred—for example, he was still coming to terms with the fact that Duckett had duped him into believing certain things were

true when they were obviously not. Anderson did not appear to be deliberately holding anything back but instead seemed to be genuine in his attempts to reconstruct what had occurred while his professional life was imploding.

Following this initial proffer, Anderson agreed to ███████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████. Counsel for Anderson allowed him to communicate directly with the criminal investigators, which streamlined the investigative process.

In entering into the cooperation agreement, Anderson understood and agreed that this might require him to testify at trial against Duckett. While Anderson expressed concerns about being a witness, he nonetheless agreed that this was something he would do. During the pre-trial process, Anderson and his attorney met with the Government on several occasions for preparation. Anderson appeared genuine in his commitment to prepare for trial and reviewed the exhibits carefully, asked questions about the process, and made himself freely available to meet whenever the Government requested.

As the Court is aware, Anderson testified in Duckett's trial over the course of two days for several hours and faced a vigorous and lengthy cross-examination. Following trial, Anderson understood that he might have to testify again at Duckett's sentencing or at a restitution hearing, and that he would ultimately face the Court for his own sentencing.

B. <u>Significance and Usefulness of Anderson's Assistance</u>

Anderson's assistance in this investigation, and his ultimate agreement to testify, was critical to the Dillon Stadium investigation and the prosecution and conviction of James Duckett.

In terms of the investigation, Anderson identified the critical players, entities, and transactions soon after the investigation began, which allowed FBI investigators to subpoena the necessary documents and interview the appropriate witnesses to further the investigation. Anderson provided investigators with PSMG's emails, including those with Big Span, Rabbi Levy and Dr. Rahul, which allowed investigators to follow how and why Anderson and Duckett diverted the City's money. Anderson also explained the PSMG bank account records and identified which transactions legitimately related to the Dillon Stadium project and which transactions were unrelated. Ultimately, Anderson confirmed that he and Duckett agreed to misuse the City's money for their own benefit and to submit the false Big Span invoices to generate more payments from Hartford. While the Government might have ultimately reached the same conclusion in its investigation, it would have been a lengthier and more difficult task without Anderson's assistance.

In addition to identifying those who had been involved in the fraud, Anderson helpfully explained who was not involved in the scheme. In the Government's view, identifying who is *not* criminally responsible is as critical a role for a cooperating witness as is identifying the criminal wrongdoers. For example, Anderson explained

that he had deliberately kept PSMG employee Tom Novajasky in the dark of what he and Duckett were up to, which allowed investigators to approach and obtain the cooperation of Novajasky as a witness and not a target.  Similarly, Anderson explained that one of Duckett's employees, Mike Garbeck, did not appear to have any knowledge that Anderson and Duckett were diverting the City's funds, which allowed the investigators to focus their attention on the real wrongdoers.

In terms of the prosecution of James Duckett, the Government submits that Anderson was a compelling witness whose testimony helped tell the story of how the fraud took root and developed.  Anderson's testimony was credible and significantly corroborated by the other documentary evidence and witness testimony.  He appeared to make an honest attempt to listen to each question and provide a truthful answer, even when the answer cast him in an unflattering light.  He did not downplay his own wrongdoings or blame others, but soberly told the story of how the Dillon Stadium project went so wrong.  The Government believes that the jury credited Anderson's testimony based upon its swift verdict of Duckett.

    C.    <u>Truthfulness, Completeness and Reliability of Anderson's Information</u>

The Government believes that the information provided by Anderson over the course of his nearly two years of cooperation was truthful and complete.  Duckett's attorney argued that Anderson's recall of specific details was not always spot-on but the Government does believe that Anderson made his best efforts to provide truthful and accurate information.

    D.    <u>Timeliness of Anderson's Assistance</u>

Anderson's assistance was timely, as he agreed to speak with the Government only two weeks after the story broke about Duckett's background and the missing City funds.

### E. Injury to Anderson Resulting from His Assistance

Cooperation with the Government always carries a risk of danger. That risk was heightened when Anderson was publicly disclosed as a cooperating witness and testified at trial against James Duckett. Anderson's testimony was reported at length in the Connecticut news media.

In agreeing to cooperate with law enforcement and to provide information about others, Anderson risked harassment to both himself and his family members. The Government is not aware of any specific threats of harm to Anderson but believes that Anderson's agreement to cooperate and to testify in public has caused both him and his family additional stress beyond just own his criminal charges.

## III. CONCLUSION

The Government believes that the nature and extent of the assistance provided by Mitchell Anderson was significant and warrants the granting of the Government's motion.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

/s/

SARAH P. KARWAN
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct22911
157 Church Street, 23rd Floor
New Haven, CT   06510
Tel.: (203) 821-3700
Fax: (203) 773-5391
sarah.p.karwan@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on February 5, 2018, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.   Parties may access this filing through the Court's CM/ECF System.

/s/

SARAH P. KARWAN
ASSISTANT UNITED STATES ATTORNEY